IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

JUDICIAL WATCH, INC.,

                 Plaintiff,

v.

NORTH CAROLINA, *et al.*,

                 Defendants.

Civil Action No. 3:20-cv-211-RJC-DCK

**PLAINTIFF JUDICIAL WATCH'S MEMORANDUM IN OPPOSITION TO
THE LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA AND
THE NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE'S
<u>MOTION TO INTERVENE AS DEFENDANTS</u>**

Plaintiff Judicial Watch ("Plaintiff") submits this Memorandum in Opposition to the Motion to Intervene filed by League of Women Voters of North Carolina and the North Carolina A. Philip Randolph Institute ("Movants"). (Doc. Nos. 19 and 20.)

<u>**INTRODUCTION**</u>

It is settled law in this Circuit that the Plaintiff, as the master of complaint, controls the scope and named parties in their complaint, subject only to the rules of joinder. *Johnson v. Advance Am.*, 549 F.3d 932, 937 (4th Cir. 2008) (citations omitted) (collecting cases). Here, Plaintiff made narrow claims that culminate in separate counts against Defendants for violations of Section 8(a) and (i) (52 U.S.C. § 20507(a) & (i)) of the National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq*., as amended (NVRA). The only relief Plaintiff seeks is enforcement of the federal statute.

Movants make clear that they intend to expand this litigation to cover issues well outside the scope of the complaint, including remedies Plaintiff does not seek and matters litigated by other parties in other proceedings. Moreover, statements by Movants in their papers—and public statements by their counsel—show their intent to attempt to transform the nature of this case. While Movants may have political preferences as to how the NVRA should be enforced, these cannot justify intervention. *See Texas v. U.S.*, 805 F.3d 653, 657 (5th Cir. 2015) ("[A]n intervenor fails to show a sufficient interest when he seeks to intervene solely for ideological . . . reasons; that would-be intervenor merely *prefers* one outcome to the other.") (citations omitted).

Movants' interest in protecting registration of *eligible* voters is several degrees removed from the issues involved here, and that interest will not be impaired by any remedy in this case Plaintiff will seek. As set forth below, Movants have not shown a protectable interest, they have not demonstrated that this interest could be impaired by the outcome of this case, and they cannot overcome the strong presumption in this Circuit that the Defendants adequately represent the public interest. Movants have not shown, nor even affirmatively argued, that Defendants do not share the same objectives as Movants, do not represent their interests, or are not as well situated as Movants to defend against the claims at issue. Further, permissive intervention would cause undue delay and unnecessarily expand narrowly pleaded claims. Movants instead speculate and argue without evidence that presently unknown and unrequested relief—that might be imposed at the remedial stage of this litigation—might violate federal law. It is pure conjecture that Plaintiff would request "unnecessary, improper, or unlawful purges of voting rolls" or that Defendants would agree to such things, much less that this Court would order such relief. (Doc. No. 20 at 8.) Movants' worst fears, unsupported by facts or the record, do not support intervention in this case.

- 2 -

# BACKGROUND

## The Relevant Requirements of the NVRA

The NVRA was enacted for two stated purposes: first, to "increase the number of eligible citizens who register to vote" and "enhance[] [their] participation" in federal elections; and second, "to protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b). The Act increased voter participation in several ways, notably by requiring that state driver's license applications also serve as voter registration applications, which gives the law its popular name, "Motor Voter." *Id.*, § 20504(a)(1).

The second goal, ensuring election integrity and accurate and current voter rolls, was embodied in Section 8 of the NVRA, which is the subject of this lawsuit. 52 U.S.C. § 20507. It requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" death or "a change in the residence of the registrant." *Id.*, § 20507(a)(4).

Section 8 provides that the name of a voter who has changed residence is removed from the rolls in one of two ways. First, it is removed if the voter confirms a move in writing. 52 U.S.C. § 20507(d)(1)(A). Second, if a forwardable notice requesting address confirmation is mailed to a voter, and if the voter then fails to respond to it and does not "vote[] or appear[] to vote" for two general federal elections—basically, a period of from two to four years—that voter's name is removed from the rolls. *Id.*, § 20507(d)(1)(B); *see Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1841-42 (2018) ("federal law makes this removal mandatory."). Until the statutory period has run, voters who have not responded to address confirmation notices are said to be "inactive." (Doc. No. 1, Complaint ¶ 18.) Such voters may vote at any time during that period (52 U.S.C. § 20507(e)), at which point they are considered "active" again, and the removal process stops.

- 3 -

**The Allegations in the Complaint**

The complaint alleges that Defendants have failed to adhere to Section 8(a)(4)'s mandate to institute a program that makes a reasonable effort to remove voters who have died or changed residence. (Doc. No. 1, ¶ 73 (Count I)). Putting a finer point on it, Plaintiff alleges that Defendants have failed to remove enough registrations, and particularly enough inactive registrations, under the procedures set forth in Section 8(d)(2).[1]

To show this, the complaint alleges several categories of relevant facts. It alleges that the number of registrations reported in 2019 by North Carolina and by several of its counties to the federal Election Assistance Commission (EAC) exceeded Census Bureau estimates of the number of adult citizens old enough to vote. (Doc. No. 1, ¶¶ 32-39; 60-61.) It alleges unusually large numbers of *inactive* registrations in North Carolina and its counties, which means that Defendants are not removing such registrations after the statutory waiting period as required by Section 8(d). (Doc. No. 1, ¶¶ 40-46.) The complaint also alleges that a significant proportion of these inactive registrations "have shown no voting activity for longer than the prescribed statutory waiting period of two general federal elections"—specifically, "since prior to election day 2014." (Doc. No. 1, ¶¶ 55-57.) And the complaint identifies a specific mechanism to explain this, namely, that "the State Board has adopted a list maintenance practice that delays for up to two years the sending of address confirmation notices to certain registrations that show no voting activity." (Doc. No. 1, ¶ 58.) This practice, embodied in official manuals, is alleged to be without a statutory basis. *Id.* The only remedy sought in the complaint is compliance with existing federal law. (Doc. No. 1, Prayer for Relief.)

---

[1]	Plaintiff also sued under Section 8(i) of the NVRA to compel Defendants to provide records about their voter list maintenance programs. 52 U.S.C. § 20507(i); (Doc. No. 1, ¶¶ 27-31 & Count II.) Movants do not assert an interest in this claim and accordingly it plays no role here.

Note that all of the registration information cited in the complaint comes from Defendants' own data. The EAC's data about North Carolina's registration rates was supplied to it by Defendants. (Doc. No. 1, ¶ 33); *see* 11 C.F.R. § 9428.7. And the current active and inactive registration rates for North Carolina and each of its counties, along with all individual registration records and voter histories, are posted and available on the North Carolina State Board of Elections' website. Popper Decl., ¶¶ 8-9. The manual incorporating the State's list maintenance practices was provided by the State pursuant to Plaintiff's public records request, and is available on the same site. *Id.*, ¶ 10. (Doc. No. 1, ¶ 58.)

**The Motion to Intervene**

On April 21, 2020, Movants, two non-profit organizations, represented by several attorneys from two other non-profit organizations, filed the instant motion to intervene either as of right or permissively alongside state and county Defendants, as well as a proposed Answer. (Doc. No. 19, 20-2.) Movants' claimed interest in this case is "ensuring that qualified voters are able to register and, so long as they remain eligible, remain registered and able to meaningfully participate in the political process." (Doc. Nos. 20 at 2; 20-3 (Nicholas Decl.), ¶¶ 3-6; and 20-4 (Montford Decl.), ¶¶ 4-6.) This interest is claimed on the basis of registration drives conducted by Movants in North Carolina, including in Guilford and Mecklenburg Counties, and assistance they provided voters in casting their ballots. (Doc. No. 20 at 3.) According to Movants, Plaintiff's suit "will undermine [their] voter registration efforts" and require them to expend additional resources in helping voters stay registered. *Id.*

As discussed more fully below, there is a hole in the center of Movants' argument, in that their depiction of Plaintiff's lawsuit has almost nothing to do with Plaintiff's actual lawsuit. Indeed, Movants' papers seems to be written for another case. They attribute to Plaintiff an intent

to make showings that Plaintiff does not, in fact, intend to make, and to seek relief that it does not intend to seek. Nor is intervention justified by the mere fact that Movants engage in voter registration; otherwise, dozens of organizations (or more) would have automatic access to every NVRA lawsuit. Movants' motion to intervene should be denied.

## ARGUMENT

## I. THE COURT SHOULD DENY MOVANTS' REQUEST FOR INTERVENTION AS OF RIGHT.

Movants first seek to intervene as of right under Federal Rule of Civil Procedure 24(a)(2), which permits intervention upon timely application only if Movants show "(1) an interest in the subject matter of the action; (2) that the protection of this interest would be impaired because of the action; and (3) that the applicant's interest is not adequately represented by existing parties to the litigation." *Stuart v. Huff*, 706 F.3d 345, 349 (4th Cir. 2013), quoting *Teague v. Bakker*, 931 F.2d 259, 260-61 (4th Cir. 1991). "It is well settled that district court rulings on both" of-right and permissive intervention are "reviewed for abuse of discretion." *Id.* (citation omitted).

Movants must meet all three tests to prevail. *Virginia v. Westinghouse Electric Corp.*, 542 F.2d 214, 216 (4th Cir. 1976). They fail on all three grounds.[2]

### A. Movants Have No "Significantly Protectable Interest" in the Subject Matter of this Case.

Intervention as of right requires a movant to have an interest in the subject matter of the action. Fed. R. Civ. P. 24(a)(2). The Supreme Court has determined that this interest must be "a significantly protectable interest." *Donaldson v. United States*, 400 U.S. 517, 531 (1971). This exists when an intervenor "stand[s] to gain or lose by the direct legal operation" of the judgment

---

[2]     Plaintiff does not contest timeliness for either as of right or permissive intervention. However, in the context of permissive intervention the prejudice that results from delay is separate and distinct from the prejudice that results from the admission of additional parties. There is prejudice of the latter kind, as Plaintiff explains, *infra* Part II.

in the case. *Teague*, 931 F.2d at 261.

Movants cannot make this showing. The only relief Plaintiff has requested is to enforce the requirements of federal voting law. Taking *ineligible* voters who have moved to another jurisdiction off the rolls in North Carolina simply does not affect Movants' interest as it relates to *eligible* voters. No provision of the U.S. Constitution, the Voting Rights Act, or North Carolina law guarantees that a person who is not a legal resident of a particular jurisdiction has some sort of protected legal right to stay registered there.

Disregarding the relief Plaintiff actually seeks, Movants instead speculate about the relief Plaintiff *might* seek (and, presumably, the Court *might* order).[3] Movants open their brief by speculating that registrations might be "improperly or illegally canceled as a result of the Plaintiff's demand for a court-ordered program to remove voter registrants from the voter rolls . . . on the basis of flawed and inflated data analysis roundly rejected by other courts." (Doc. No. 20 at 2.)[4] Movants never identify any paragraph in the complaint that inspired this fear, and we are left to guess. If the concern is over allegations describing high registration rates, these are common in this kind of case. Federal courts in this State and elsewhere have recognized that registration rates exceeding 100% support a claim that Section 8 has been violated. *Voter Integrity Project NC, Inc. v. Wake Cnty. Bd. of Elections*, 301 F. Supp. 3d 612, 620 (E.D.N.C. 2017) (the "allegation that the number of registered voters . . . has exceeded, and continues to exceed, the number of eligible

---

[3]    At times, Movants seem to dispute whether federal courts can order *any* compliance with Section 8(a)(4). (Doc. No. 20 at 2 ("No such court-ordered 'list maintenance' is appropriate under—much less required by" the NVRA, "a federal statute designed to make it easier for citizens to become and remain registered to vote")); *but see Husted, supra,* 138 S. Ct. at 1841-42. If Movants wish to make a facial challenge to the NVRA's mandates, they could initiate their own proceeding in a forum of their choosing.

[4]    For the record, none of Plaintiff's NVRA data or analysis has ever been rejected by any court. Plaintiff respectfully submits that Movants' baseless claim that Plaintiff intends to offer "flawed data . . . rejected by other courts" in pursuit of an order illegally cancelling registrations suggests, if anything, the litigation style Movants would bring to this case.

voters" supports the inference that the defendant "is not making a reasonable effort to conduct a voter list maintenance program in accordance with the NVRA"); *Bellitto v. Snipes*, No. 16-cv-61474-Bloom/Valle, 2017 U.S. Dist. Lexis 107355, at *52-53 (S.D. Fla. July 11, 2017) (high "voter registration rates . . . at the very least create a reasonable inference that" defendant "has failed to meet the reasonableness requirement under" Section 8(a)(4)); *Am. Civ. Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 793 (W.D. Tex. 2015) ("an implausible 105% registration rate gives rise to the strong inference that the Defendant failed to conduct a reasonable voter list maintenance program"). The U.S. Department of Justice relies on the same kind of allegations in its Section 8 complaints. Popper Decl., ¶¶ 5-7. If the concern is instead over data regarding inactive registrations or voters' most recent voting activity, that data comes straight from Defendants. *Id.*, ¶¶ 8-9.

Movants go on to assert that Plaintiff seeks to "unnecessarily implement new, and therefore untested and potentially unreliable procedures," without ever saying what these procedures are, let alone where they may be found in Plaintiff's complaint. (Doc. No. 20 at 3; *see* Doc. No. 20-3, ¶ 10 ("new, untested, or unwarranted methods outside of their normal processes")). In the same vein, Movants warn against "aggressive—and potentially unlawful—list maintenance strategies that Plaintiff would have the Court order," and "unnecessary, improper, or unlawful purges of the voting rolls." (Doc. No. 20 at 4, 8; *see* Doc No. 20-4, ¶ 11 ("unwarranted list maintenance procedures based on incorrect data")). Plaintiff has not asked for "new," "untested," "unwarranted," or "unlawful" procedures, and it simply would not "have the Court order" them. Movants cannot pile up adjectives and adverbs, repeat them, and thereby create an interest.

The cases Movants cite granting intervention or otherwise recognizing interests in NVRA cases all concerned claims where either the plaintiffs demanded, or the defendants adhered to,

procedures not included in or authorized by the NVRA. For example, in *Bellitto v. Snipes*, No. 16-cv-61474-Bloom/Valle, 2016 U.S. Dist. LEXIS 128840, at *6 (S.D. Fla. Sept. 21, 2016), the intervenors' argument that "the court-ordered 'voter list maintenance' sought by Plaintiffs . . . could itself violate the NVRA," was more than speculation. The plaintiffs argued that the supervisor of elections for Broward County, Florida violated the NVRA by failing to use jury recusal forms to conduct list maintenance, among other things. *Bellitto v. Snipes*, No. 16-cv-61474-Bloom/Valle, 2018 U.S. Dist. LEXIS 103617, *54 (S.D. Fla. Mar. 30, 2018). The court declined to find that this was required by the NVRA. *Id.* at *56-58. Similarly, the complaint in *Voter Integrity Project NC, Inc. v. Wake Cty. Bd. of Elections*, Case No. 5:16-cv-683 (E.D.N.C. 2016)[5] alleged that Wake County made "absolutely no effort whatsoever to use data . . . obtained from jury excusal communication" for, among other purposes, identifying "non-citizens." Ex. 2 (complaint), ¶ 19; *see Common Cause/N.Y. v. Brehm*, 344 F. Supp. 3d 542, 557-58 (S.D.N.Y. 2018) (noting plaintiff's plausible claim that New York engages in "de facto removal" of voters by informing inactive voters they were no longer registered *prior* to waiting the mandatory two general federal elections); *N.C. State Conf. of the NAACP v. North Carolina State Bd. of Elections*, No. 1:16-cv-1274, 2016 U.S. Dist. LEXIS 153249, at *4, *30-31 (M.D.N.C. Nov. 4, 2016) (enjoining removal of voters based on single mailings returned undeliverable *prior* to waiting the mandatory two general federal elections); *Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1153 (S.D. Ind. 2018) (removing voters for change of address *without* first sending the forwardable address confirmation notice, in violation of the NVRA); *see also Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (plaintiffs' standing derived from use of Department of Homeland Security's SAVE database to identity non-citizens for removal).

---

[5] The order granting permissive intervention in that case is attached to Movants' papers. (Doc. No. 20-5.)

Judicial Watch was not a party in any of these cases. To be clear, Judicial Watch is not seeking any of these procedures as remedies here.

Indeed, only one case is truly analogous to the instant case: *Judicial Watch v. Logan*, 2:17-cv-8948 (C.D. Cal. 2017). In that case, Judicial Watch was both a plaintiff and counsel. The claims against the clerk of Los Angeles County and the California secretary of state mirrored those alleged here, including that registration rates were too high, there were too many inactive registrants, and the official list maintenance manual misstated the relevant law; and the relief sought was simple compliance with the NVRA. Popper Decl., ¶ 12. Two groups of organizations sought to intervene, including the local chapter of the League of Women Voters, and they were represented by some of the same counsel as here. *Id.*, ¶ 13. They also argued that their voter registration efforts constituted a protectable interest. *Id.* Their motion used many of the same phrases, alluding, for example, to "untested methods of list maintenance." *Id.*.

The Court denied intervention, in an order that was later vacated after the case settled. Ex. 3 (Order Denying Motions to Intervene, *Judicial Watch v. Logan*, 2:17-cv-8948 (C.D. Cal. July 12, 2018) (Doc. No. 76), *vacated sub nom. Judicial Watch, Inc. v. Padilla*, Nos. 18-56102 & 18-56105, 2019 U.S. App. LEXIS 8347 (9th Cir. Mar. 20. 2019)). The order is instructive. The Court acknowledged that the movants' goals included "improv[ing] voter registration efforts" and "involv[ing] more citizens in the political process by assisting and mobilizing voters," and that, as a result, they had a "legally protected interest to ensure that eligible voters maintain their right to vote and remain on the voter rolls." *Id.* at 2. However, the Court reasoned that this did not amount to a "significantly protectable interest" supporting intervention, because "there is no relationship between this interest and the claims at issue. Plaintiffs request that Defendants reasonably attempt to remove *ineligible* voters from the voter rolls. Removing ineligible voters from the voter rolls

- 10 -

will not affect eligible voters' rights." *Id.*

The same reasoning warrants denying intervention here. This suit has nothing to do with gathering and processing voter registration applications. Even if Plaintiff prevails on 100% of its claims and this Court orders Defendants to comply with Section 8(a)(4), Movants will still be able to register voters, participate in voter registration drives, and conduct outreach efforts. Movants' asserted interest lacks the "direct legal" connections to the issues involved here, as necessary to show a significantly protectable interest. *Teague*, 931 F.2d at 261. Movants' stated interests are too general to support intervention. There are many other organizations in North Carolina that conduct voter registration efforts. All have an "interest" in the outcome of NVRA cases, but not the "significantly protectable interest" required under Rule 24(a). *McHenry v. Comm'r*, 677 F.3d 214, 227 (4th Cir. 2012); *see also Ohio Valley Envtl. Coalition v. McCarthy*, 313 F.R.D. 10, 21-22 (S.D. W. Va. 2015). Movants' argument makes it impossible to tell where protectable interests end in the voting context.

Ultimately, all of Movants' extravagant fears about the remedies Plaintiff will seek are belied by the two current NVRA settlements in which Plaintiff is a party. Ex. 4 (*Logan* settlement, dated January 3, 2019); Ex. 5 (Consent Judgment in *Judicial Watch v. Grimes*, 3:17-cv-94 (E.D. Ky. 2017), ordered July 3, 2018). In *Logan*, the heart of the agreement is simple, requiring the defendants to identify inactive registrants who have received a Section 8(d)(2) confirmation notice and are within the statutory waiting period, to send confirmation notices to all other inactive registrants, to correct an errant list maintenance manual, and to report key documents and records on an annual basis. Ex. 4 at 6-10. In *Grimes*, Judicial Watch entered into a court-ordered Consent Judgment with the Commonwealth, state officials, and the United States (which intervened with the consent of the parties) requiring the defendants to develop a

- 11 -

comprehensive plan, consistent with state and federal law, to develop reliable procedures to identify those who may have moved; to send an initial, non-forwardable mailing to those who may have moved; to regularly send Section 8(d)(2) notices and track and remove registrants per the NVRA and Kentucky law; and to regularly report list maintenance documents, data, and activities. Ex. 5 at 8-16. Neither agreement incorporates the procedures from the cases Movants collect.

For all of the foregoing reasons, Movants have failed to state a significantly protectable interest in this case sufficient to justify intervention.

## B. Movants Have No Interest that Will be Impaired in this Case without Their Participation.

Movants must also show that "the denial of intervention would impair or impede the applicant's ability to protect its interest." *Scardelletti v. Debarr*, 265 F.3d 195, 202 (4th Cir. 2001), *rev'd on other grounds sub. nom.*, *Devlin v. Scardelletti*, 536 U.S. 1 (2002). This involves determining whether the "(1) disposition of the action would put the movant at a 'practical disadvantage' in protecting its interest, or (2) the stare decisis effect of a judgment would legally preclude the would-be intervenor from protecting its interests later." *McCarthy*, 313 F.R.D. at 26, quoting *Francis v. Chamber of Commerce of U.S.*, 481 F.2d 192, 195 n.8 (4th Cir. 1973).

For all the same reasons that Movants cannot show a legally protectable interest related to the subject matter of this action, they cannot show any impairment of their ability to protect their interests. Movants repeatedly speculate their interests may be harmed *if* Plaintiff prevails and *if* this Court grants, not the relief sought in the complaint, but what they call "unnecessary, improper, or unlawful purges of voting rolls." (Doc. No. 20 at 8.) Such empty rhetoric is insufficient to satisfy Rule 24's requirement that Movants must have a protectable interest related to Plaintiff's claims that will be impaired without their participation.

- 12 -

Any suggestion that relief might be granted which authorizes an immediate mass purge, possibly upending get-out-the vote efforts during the 2020 election cycle, is inaccurate. (*E.g.*, Doc. No. 20 at 10 n. 2.) The NVRA mandates a 90-day quiet period prior to each federal election, which applies to "any program the purpose of which is to systematically remove the names of ineligible voters" who may have changed residence. *See* 52 U.S.C. § 20507(c)(2)(A), (2)(B). This means any settlement or court-ordered relief here (presumably after trial) would need to be finalized *and* implemented by August 3, 2020, which is practically impossible. Since Defendants' first responsive pleadings are not due until June, there is no reason to believe that discovery, pre-trial motions, and trial would be concluded by that date. Moreover, even assuming, *arguendo*, that registrations would be "improperly" cancelled, and that Movants have an interest arising from this, the date on which such harm would accrue would be even further in the future. Under the NVRA, there is no way to speed up the statutory waiting period for a registrant who fails to respond to a Section 8(d)(2) notice. Thus, the alleged harm from "improper" removals of those sent confirmation notices would only occur from two to four years after any such remedy is ordered. Future events are not a basis for granting intervention. *See United States v. Michigan*, 424 F.3d 438, 444 (6th Cir. 2005) ("While the proposed intervenors may be legitimately concerned about these future issues, they are not now, and possibly never will be, before the district court.") .

Movants face no adverse stare decisis effect. Their speculations about relief Plaintiff might seek and the Court might order are not sufficient to describe such an effect. *Greene v. United States*, 996 F.2d 973, 977 (9th Cir. 1993) (denying intervention where the movant's "interest in preserving the favorable effects of *stare decisis* is too speculative"). Should Movants' members face unlawful removals, they are provided a remedy through the federal voting laws. The NVRA affords to Movants and their members a private right of action for a "person who is aggrieved by

a violation" of the Act. 52 U.S.C. § 20510(b). Section 2 of the Voting Rights Act also grants a private cause of action where voting restrictions or procedures "result[] in a denial or abridgement" of a citizen's right to vote "on account of race or color." 52 U.S.C. § 10301(a). These private remedies counsel against finding any stare decisis effect. *See Logan* at 2 (Ex. 3) (finding no impairment of interest because, if eligible voters were wrongfully removed from the rolls, the intervenors "may bring a separate, private cause of action to vindicate these voters' rights"); *Virginia*, 542 F.2d at 216-17 (finding the Commonwealth of Virginia's interest was not impaired solely because they were left out of settlement discussions in the instant action and where "[a]t least thirteen other states [were] possible litigants"); *McCarthy*, 313 F.R.D. at 26 (The "practical disadvantage of filing a separate suit … is not sufficient to satisfy the impairment prong.").

### C. Movants Have Not Overcome the Strong Presumption of Adequate Representation by the Government Defendants.

Generally, Rule 24(a)(2)'s third requirement, whether a proposed intervenor's interest is adequately represented by existing parties, is satisfied "if it is shown that representation of [the intervenor's] interest '*may be*' inadequate." *In re Sierra Club*, 945 F.2d 776, 779 (4th Cir. 1991) (citations omitted). In an ordinary case, an intervenor need only make a "minimal" showing that representation may be inadequate by existing parties. *United Guaranty Residential Ins. Co. v. Philadelphia Sav. Fund Soc.*, 819 F.2d 473, 475 (4th Cir. 1987) (citation omitted).

But where an intervenor shares objectives with a party, and particularly with government defendants, the Fourth Circuit has adopted a heightened, more exacting standard. "When the party seeking intervention has the same ultimate objective as a party to the suit, a presumption arises that its interests are adequately represented, against which the petitioner must demonstrate adversity of interest, collusion, or nonfeasance." *Virginia*, 542 F.2d at 216 (citation omitted). Where intervenors "share the same ultimate objective as the existing defendants and where those

- 14 -

defendants are represented by a government agency," "the putative intervenor must mount a strong showing of inadequacy." *Stuart*, 706 F.3d at 352.

The reason for this strong presumption is clear: Allowing private parties in litigation where the government is defending a statute "greatly complicate[s] the government's job." *Stuart*, 706 F.3d at 351. "In matters of public law litigation," "it is the government's basic duty to represent the public interest." *Id.* Where governmental conduct is challenged, this "representative function is perhaps at its apex" since the government is "the most natural party to shoulder the responsibility of defending the fruits of the democratic process." *Id.* Only the State "is entitled to create a legal code," and therefore it is also the only party with a "direct stake" in "defending the standards embodied in that code." *Id.*, quoting *Diamond v. Charles*, 476 U.S. 54, 65 (1986).

Here, Movants do not even attempt to rebut the strong presumption of adequacy of representation. Movants generally contend that the existing Defendants will not adequately represent their interests, because they "may not be aligned with those of Defendant-Intervenors," and because of a stated concern that several Defendants, including the State of North Carolina, have limited resources. (Doc. No. 20 at 10-11.) Notwithstanding the Circuit's strong presumption that the government adequately represents the public interest, Movants fail to cite any fact that might show that Defendants' interests are adverse to theirs—nor could they, as Defendants have yet to respond to the complaint.

Movants argue that their interests are "more narrowly focused" than those of existing Defendants, (Doc. No. 20 at 11), but that does not establish inadequate representation. As the Fourth Circuit explained in considering a similar argument:

> At bottom, appellants' argument is that . . . their interests . . . are "stronger" and more "specific" than the state's general interest. But stronger, more specific interests do not adverse interests make—and they surely cannot be enough to establish inadequacy of representation since would-be intervenors will nearly

- 15 -

> always have intense desires that are more particular than the state's (or else why seek party status at all). Allowing such interests to rebut the presumption of adequacy would simply open the door to a complicating host of intervening parties with hardly a corresponding benefit.

*Stuart*, 706 F.3d at 353. Just as in *Stuart*, the Movants here, without identifying any specific question where there might be adversity, or citing any specific fact to show such adversity, ask this Court to ignore the strong presumption in this Circuit that the government represents the public interests. Movants' argument must fail.

Movants' citations to *Bellitto*, 2016 U.S. Dist. LEXIS 128840, at *6, and *Kobach v. U.S. Election Ass. Comm'n*, Case No. 13-cv-4095, 2013 U.S. Dist. LEXIS 173872 (D. Kan. Dec. 12, 2013) are unavailing. Both cases are easily distinguished. *Bellitto* is inapposite because it was a district court decision in the Southern District of Florida, and the Eleventh Circuit has not consistently applied the presumptions of adequacy of representation that the Fourth Circuit has so clearly endorsed. *See Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 910 (11th Cir. 2007) (characterizing the presumption of adequacy raised by common objectives as a "weak" one). *Kobach* is inapposite because there, the League of Women Voters could show *actual* adversity of interests. The plaintiff, Kansas Secretary of State Kris Kobach, was a vocal supporter of the documentary proof-of-citizenship requirement. He sued the EAC when the agency's director denied Kansas' request to include a citizenship requirement on the federal form. 2013 U.S. Dist. LEXIS 173872, at *5-6. Two of the four EAC Commissioners voted in favor of Kansas' request. *See Kobach v. United States Election Assistance Comm'n*, 772 F.3d 1183, 1188 (10th Cir. 2014). Intervenor-defendant League of Women Voters, as an organization opposed to the documentary proof-of-citizenship requirement, could clearly show an adversity of interest with those two EAC defendants. By contrast, Movants here have not identified a single point of adversity between them and Defendants.

- 16 -

Movants assert the state's limited resources and financial constraints demonstrate inadequacy of representation, (Doc. No. 20 at 9-10, 11), but this argument also fails. Even if these concerns had a ground in reality (they do not), they would, if accepted, swallow the general rule that government representation is presumed to be adequate. "Virtually all governments face budget constraints generally, and if such a basis were sufficient to establish inadequate representation, it would eliminate the presumption of adequate representation when the government and the intervenor-applicant share the same interest." *Prete v. Bradbury*, 438 F.3d 949, 957 (9th Cir. 2006). Movants' reliance on *Teague v. Bakker*, 931 F.2d 259, 262 (4th Cir. 1991) is utterly misplaced. There, two of the three defendants were prisoners "with no significant source of income." *Id.* None of the defendants were governmental entities.

North Carolina, by contrast, is set to receive $11.6 million for election administration under the federal Help America Vote Act (HAVA) that President Trump approved in December, in addition to its $10.9 million for its elections from the $2.2 trillion COVID-19 stimulus bill Congress passed in March. The State Board of Elections could receive $27 million if the North Carolina General Assembly matches.[6] Among others, these resources will address issues that arise from the COVID-19 pandemic.[7] In any case, Defendants have already shown they have sufficient resources to defend against Plaintiff's claims. To date, six attorneys from the North Carolina Attorney Generals' Office, Guilford County Attorney's Office, and from a large private law firm

---

[6]     *See* Jim Morrill, *With new federal money, NC elections officials prepare for surge of absentee voting*, CHARLOTTE OBSERVER, April 3, 2020, available at https://www.charlotteobserver.com/news/politics-government/election/article241718946.html.

[7]     Movants repeatedly invoke the COVID-19 pandemic as a reason why the State is not in a position to adequately represent them now. (Doc. No. 20 at 4, 10 n.2, 11.) Plaintiff, like everyone, is aware of the ongoing public health crisis. That said, given that the NVRA's 90-day quiet period commences in early August, that this case will likely not be resolved by then, and that the Section 8(d)(2) process takes years, the pandemic does not enhance the urgency of either this case or Movants' putative interest. See *supra*, at 13.

- 17 -

have entered an appearance on Defendants' behalf .

Movants failed to make *any* showing, much less one that would overcome a strong presumption, that their interests are adequately represented. They do not show "adversity of interest, collusion, or nonfeasance" between the existing government defendants and plaintiffs. *Virginia*, 542 F.2d at 216. This failure alone is sufficient to deny their motion for intervention as of right.

## II.    THE COURT SHOULD DENY MOVANTS' REQUEST FOR PERMISSIVE INTERVENTION.

In the alternative, Movants seek to intervene permissively. A court "may" allow intervention where an applicant demonstrates "a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(2). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication." Fed. R. Civ. P. 24(b)(3).

Movants fail at the first step in this inquiry, in that they have not identified a common question of law or fact with regard to the claims in this action. Count I of the complaint and the allegations underlying it raise a single question: Are Defendants complying with Section 8(a)(4)'s requirement that they "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death . . . [or] a change in the residence of the registrant"? Movants do not claim to know any facts about this question. Movants have no firsthand knowledge regarding how the Defendants carry out their NVRA duties. Notably, Movants' proposed Answer provided them the opportunity to demonstrate that they had some knowledge regarding Defendants' efforts to remove ineligible registrations pursuant to the NVRA. (Doc. No. 20-2.) Instead, Movants responded that they "lack[ed] knowledge or information sufficient to form a belief about the truth of the allegations" and denied

- 18 -

"on that basis," the following critical, factual matters:

- that many of North Carolina's counties, including Mecklenburg County and Guilford County, and the State as a whole, had registrations rates at the time of the EAC report close to or greater than 100% of their age-eligible citizenry (Doc. No. 1, ¶¶ 37, 38, 39);

- that February 2020 data showed Mecklenburg and Guilford Counties' current percentages of inactive registrations were 16% and 14.4%, respectively (*id.*, ¶ 54);

- that 33,561 inactive registrants in Mecklenburg County, and 15,500 inactive registrants in Guilford County, had not voted for more than three general federal elections (*id.*, ¶¶ 55, 56, 57);

- that the most recent data showed that North Carolina has one million inactive registrants on its rolls (*id.*, ¶ 59).

(*See* corresponding paragraphs in Doc. No. 20-2.) Similarly, with respect to the detailed allegations in paragraph 45 concerning what the EAC report showed about Defendants' inactive registrations, Movants denied that the relevant numbers could be characterized as "abnormally high," but otherwise pleaded a lack of knowledge or information about the actual quantities. (Doc. No. 1, ¶ 45; Doc. No. 20-2, ¶ 45.) On this reckoning, Movants will contribute nothing to the development of the underlying factual issues in this case. Movants suggest they might assert defenses to Plaintiff's allegation of high registration rates by, for example, submitting expert reports to refute Plaintiff's claims. (Doc. 20 at 13-14, citing *Bellitto*.) Given that Movants plead no knowledge or information about Plaintiff's allegations about registration rates, however, Movants are not in a position now to represent whether that testimony would favor Defendants. In any case, while the Broward County supervisor of elections in *Bellitto* might need such assistance, Movants fail to show why the State of North Carolina or the North Carolina State Board of Elections—with millions of dollars in funding and represented by the State Attorney General's Office—cannot submit their own expert reports.

- 19 -

Movants also have failed to identify a common issue of law. Their memorandum of law raises issues concerning whether Section 8 of the NVRA requires implementing a review of jury recusals, or the use of the SAVE database, or the other extra-statutory measures they fear would cancel the registrations of eligible voters. None of those measures, however, are put at issue in Plaintiff's complaint. Eligible registrations are not at issue here. As the district court in *Logan* put it in denying a similar motion, the movants

> do not meet the threshold requirements because they do not share a common question of law or fact . . . Plaintiffs are suing . . . to enforce the NVRA and remove ineligible voters from the voter rolls. By contrast, Intervenors . . . are concerned with *eligible* voters being wrongfully removed from the list. There is no reason that eligible voters would be removed from voter rolls if Plaintiffs are successful. In fact, it is purely speculative that eligible voters would be injured by ordering compliance with the NVRA.

*Logan* at 4 (Ex. 3.)

Even if Movants could identify a common question of law or fact, Fed. R. Civ. P. 24(b)(3) directs the Court to "consider whether the intervention will unduly delay or prejudice the adjudication." *Id.* Such undue delay or prejudice can include the practical consequences of adding parties to a litigation. In *Stuart*, the Fourth Circuit approved the district court's reasoning when it "denied permissive intervention on the ground that adding the intervenors would 'complicate the discovery process and consume additional resources of the court and the parties.'" 706 F.3d at 349 (internal citation omitted). The Court affirmed the district court's conclusion that "permitting intervention would likely 'result in undue delay in adjudication of the merits, without a corresponding benefit to existing litigants, the courts, or the process' because 'the existing [d]efendants are zealously pursuing the same ultimate objectives'" as the movants. *Id.* at 355 (internal citation omitted).

- 20 -

All of these factors are present here. There is no benefit to the litigants or the Court, because Movants cannot assist with the factual exposition of this case, and because the existing Defendants are fully capable of defending this matter and are presumed to adequately represent the public interest. But Movants unquestionably will complicate the discovery process by their participation in it. They also will consume additional resources of the Court and the parties. They already have announced their intention to engage in dispositive motion practice, while Defendants have yet to do so. (Doc. No. 20 at 14.)

As a final point, Movants' political approach to the issues raised by this case suggests that their participation would lead to undue delay and prejudice. In *N.C. State Conf. of the NAACP v. Cooper*, 332 F.R.D. 161, 172 (M.D.N.C. 2019), the Court denied permissive intervention to group of legislative defendants because of the "significant concern that the inclusion of the Proposed Intervenors would likely detract from, rather than enhance, the timely resolution, clarity, and focus on, solely the weighty and substantive issues to be addressed in this case." This concern was sparked by the intervenors' contentious assertions that existing defendants "cannot be trusted" to defend a statute with rigor and that they lacked the "interest . . . ability and incentive to litigate it" as the proposed intervenors would. *Id.* Noting that these allegations were unsupported, the Court concluded "that allowing this requested intervention could place additional burden on the Court in expending unnecessary judicial resources on such contentions." *Id.*

In relation to this suit, counsel for Movants has publicly expressed the view on a number of occasions that Plaintiff was "morally bankrupt" and "despicable" for bringing it, and that the action is an effort at "voter suppression." Popper Decl., ¶¶ 17-19. Plaintiff cannot fathom how it can be "morally bankrupt" or "despicable" to seek to enforce a validly enacted federal voting statute that has been on the books since 1993, or how it is "voter suppression" to seek to have

North Carolina remove from the rolls the registrations of those who have died, or, on a date two to four years from now, the registrations of those who have moved to other states or counties. If Movants wish to make a facial challenge to the NVRA, they could do so in any of the 44 states covered by the Act.

With respect to this motion, the relevant concern is that Movants will attempt to turn this case into political theater. This would "detract from, rather than enhance, the timely resolution, clarity, and focus on, solely the weighty and substantive issues to be addressed in this case," and would compel the Court to "expend[] unnecessary judicial resources on such contentions." *N.C. State Conf. of the NAACP*, 332 F.R.D. at 172. Given Movants' positions regarding this case, as expressed publicly and also in their motion papers, and their admitted lack of knowledge about the relevant facts, Plaintiff respectfully submits that Movants' participation would unduly delay the proceedings and prejudice existing parties.

For all of these reasons, permissive intervention is unwarranted and unnecessary.

## <u>CONCLUSION</u>

For the foregoing reasons, the court should deny the pending motion to intervene.

Respectfully submitted, this the 5th day of May, 2020.

*/s/ Mark A. Jones*
Mark A. Jones
N.C. State Bar # 36215
BELL, DAVIS, & PITT, P.A.
227 W. Trade Street, Suite 1800
Charlotte, North Carolina 28202
Phone: (336) 722-3700
mjones@belldavispitt.com

Robert D. Popper*
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC 20024
Phone: (202) 646-5172
rpopper@judicialwatch.org

- 22 -

Eric W. Lee*
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC 20024
Phone: (202) 646-5172
elee@judicialwatch.org

H. Christopher Coates*
LAW OFFICE OF H. CHRISTOPHER COATES
934 Compass Point
Charleston, South Carolina 29412
Phone: (843) 609-7080
curriecoates@gmail.com

T. Russell Nobile*
JUDICIAL WATCH, INC.
Post Office Box 6592
Gulfport, Mississippi 39506
Phone: (202) 527-9866
rnobile@judicialwatch.org

*  *Admitted pro hac vice*