UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Civil Action No. 3:20-cv-211

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM IN SUPPORT** |
| v. | ) | **OF THE STATE AND** |
| | ) | **GUILFORD COUNTY** |
| NORTH CAROLINA, et al., | ) | **DEFENDANTS' MOTION** |
| | ) | **TO DISMISS** |
| Defendants. | ) | |

The State and Guilford County Defendants file this memorandum in support of their

Motion to Dismiss, pursuant to Rules 12(b)(1), (2), (5), and (6) of the Federal Rules of Civil

Procedure. The Complaint should be dismissed because: (1) it was improperly served; (2) the

State and its elections agency are immune from suit under the Eleventh Amendment; (3) Plaintiff

lacks standing due to inadequate presuit notice; and (4) the Complaint fails to state a claim.

## BACKGROUND

Plaintiff alleges two violations of the National Voter Registration Act of 1993 (NVRA).

Count I alleges that the North Carolina State Board of Elections (State Board) and the

Mecklenburg and Guilford County Boards of Elections are not "conduct[ing] a general program

that makes a reasonable effort to remove" voters from the registration rolls who have died or

moved. 52 U.S.C. § 20507(a)(4). Count II alleges that that these boards did not supply records

regarding such efforts after Plaintiff requested them. *See id.* § 20507(i).

### I. The NVRA

Congress enacted the NVRA to "promote the exercise" of the right to vote and to

overcome "discriminatory and unfair registration laws and procedures." 52 U.S.C. §

20501(a)(2)–(3). To these ends, the NVRA requires states to expand voter registration

opportunities. *Id.* §§ 20503–06. It also imposes strict limits on states' ability to remove voters

from the voting rolls. *Id.* §§ 20507(a)(3), (b)–(d).

With these provisions, Congress sought to minimize voter "purge systems," which were "highly inefficient and costly," had "a long history" of being used to "violate the basic rights of citizens," particularly "minority communities." S. Rep. No. 103-6, 17–18 (1993). Thus, Congress designed the NVRA both to encourage voter registration, and "to ensure that once a citizen is registered to vote, he or she should remain on the voting rolls so long as he or she remains eligible to vote." *Id.* at 17. While Congress was "mindful of the need to keep accurate and current voter rolls," its overriding concern was that voter list-maintenance programs "can be abused and may result in the elimination of eligible voters from the rolls." *Id.* at 32.

Section 8 of the NVRA includes numerous safeguards to prevent states from improperly removing eligible voters from the rolls. *See* 52 U.S.C. §§ 20507(a)–(e). States are barred from removing voters from the rolls, except: (1) at the voter's request, or if the voter becomes ineligible due to (2) "criminal conviction or mental incapacity," (3) "death," or (4) "a change in residence" outside the voting jurisdiction. *Id.* § 20507(a)(3)–(4). To promote accurate and current voter rolls, Section 8 also requires states to conduct a "general program" that makes "a reasonable effort" to remove voters based on these last two grounds: death or moving outside the jurisdiction, *id.* § 20507(a)(4). This provision is the focus of Count I of the Complaint.

Subsection (c) is known as the NVRA's "safe harbor" provision, *Bellitto v. Snipes*, 935 F.3d 1192, 1203 (11th Cir. 2019), because it establishes a process by which a state "may meet" the "reasonable effort" requirement outlined above, 52 U.S.C. § 20507(c)(1). That process entails sending an address-confirmation mailing to all voters for whom the U.S. Postal Service has a change-of-address notification on file. *Id.* § 20507(c)(1). Then, for voters who respond by confirming that they have moved out of the jurisdiction, a state may remove them from the rolls.

2

*Id.* § 20507(d)(1)(A). For voters who do not respond to the mailing, a state may remove them from the rolls, but only if those voters fail to appear to vote in the jurisdiction in the two Federal general elections after the mailing. *Id.* § 20507(d)(1)(B).

Subsection (d) permits states to go beyond the Postal Service change-of-address data to identify voters who may have moved. It allows states to send the same address-confirmation mailing discussed above to voters who the state believes have moved (*e.g.*, because of lengthy inactivity), and to remove such voters who meet the same criteria as in subsection (c)—either they confirm in writing that they have moved out of the jurisdiction, or they fail to respond to the mailing and do not vote in the jurisdiction in the next two general elections. *Id.* § 20507(d)(1).

Subsection (i) requires states to disclose records of the "implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Count II of the Complaint relies on this provision.

## II. North Carolina's Implementation of the NVRA

North Carolina implements the requirements of the NVRA through the State Board and the 100 county boards of elections. The State Board and its executive director oversee the conduct of elections and the coordination of the State's duties under the NVRA. N.C. Gen. Stat. §§ 163-22(a), -27(d), 28, -82.2, -82.11, -82.12. The county boards conduct elections and manage voter registration in their jurisdictions. *Id.* §§ 163-33, -82.1(b), -82.6(a), -82.7, -82.8, -82.9.

North Carolina has adopted a detailed statute that implements the list-maintenance provisions of the NVRA. *See* N.C. Gen. Stat. § 163-82.14.

To remove deceased voters on the rolls, the statute requires the state health department to provide the State Board a list of North Carolina residents who have died each month. *Id.* § 163-82.14(b). The State Board then forwards those names to each county to which the names pertain,

and the county boards remove those names from the voter rolls. *Id.*

The statute also prescribes a program that county boards must follow to update the records of voters who have moved. *Id.* § 163-82.14(d). County boards remove voters who have confirmed in writing that they have moved out of the jurisdiction. *Id.* § 163-82.14(d)(1). Otherwise, a county board may remove a voter for having moved only through the address-confirmation mailing process outlined in section 8(d) of the NVRA: the county board first sends an address-confirmation notice to the voter's address, and if the voter does not respond to confirm their address and fails to appear to vote in the jurisdiction in the next two Federal elections, that voter will be removed from the rolls. *Compare id.* § 163-82.14(d)(2), *with* 52 U.S.C. § 20507(d)(1)(B). Such a mailing program takes place "after every congressional election" and must be completed by April 15 of each odd-numbered year. N.C. Gen. Stat. §§ 163-82.14(a), (d)(2). These mailings are sent "to every registrant . . . if the county board has not confirmed the registrant's address by another means." *Id.* § 163-82.14(d)(2).

State law also permits the State Board to employ the NVRA's "safe harbor" method for removing voters who have moved—by using the U.S. Postal Service's change-of-address records to identify voters to send address-confirmation mailings to. *Id.* § 163-82.14(a).

Pursuant to N.C. Gen. Stat. § 163-82.14(a), the State Board has adopted a detailed policy to instruct county boards on carrying out the requirements outlined above. *See* N.C. State Bd. of Elections, Maintaining the Voter Registration Database in North Carolina (July 27, 2017), *available at* https://go.aws/2Boq4RQ (attached as Exhibit 1).[1]

---

[1] Because this policy is referred to in the Complaint and is central to Plaintiff's claims, Compl. ¶ 58, it may be considered for all aspects of this Motion. *Mode v. S-L Distribution Co.*, No. 3:18-cv-150, 2019 WL 1057045, at *4 n.4 (W.D.N.C. Mar. 6, 2019); *Naylor v. Wells Fargo Home Mortg.*, No. 3:15-cv-116, 2016 WL 55292, at *5 (W.D.N.C. Jan. 5, 2016).

Under this policy, the county boards send an address-confirmation mailing after every congressional election. Ex. 1 at 5. Because state law requires this biennial mailing to be sent to only those voters for whom "the county board has not confirmed the registrant's address by another means," N.C. Gen. Stat. § 163-82.14(d)(2), the policy identifies ways a registrant confirms his or her address through "contact" with the elections boards: *e.g.*, voting, signing a petition, updating voter registration. Ex. 1 at 5; *see id.* at 6. Once the county board has lost contact with a voter, the board sends an address-confirmation mailing. *Id.* at 5.

State law does not identify a specific length of time that a county board must have lost contact with the voter before the board sends a confirmation mailing. *See* N.C. Gen. Stat. § 163-82.14(d)(2). The State Board's policy instructs county boards that the no-contact period that triggers a confirmation notice is a period spanning two statewide general elections. Ex. 1 at 5. Because these confirmation mailings are sent in January of every odd-numbered year, this means that the no-contact period spans approximately two years and three months. *See id.*

If a voter does not respond to a confirmation mailing, that voter becomes an "inactive voter." *Id.* at 6. Inactive voters remain on the registration rolls; but if they appear to vote, they must attest that they reside at the address on file or update their address (if they've moved in county) to have their votes counted. *See* N.C. Gen. Stat. § 163-82.15(f). Once voters become inactive, they are removed from the voter rolls if they "do[] not vote or appear to vote" in the next two federal general elections, consistent with the NVRA. *Id.* § 163-82.15(d)(2); Ex. 1 at 7; *see* 52 U.S.C. § 20507(d)(1)(B).

In addition to this no-contact confirmation mailing, the State Board also implements the "safe harbor" provision of the NVRA, which it refers to as the National Change of Address (NCOA) process. Ex. 1 at 10. Twice a year, the State Board obtains NCOA records from the

U.S. Postal Service and forwards the names of voters who have moved to the county boards. *Id.*

at 12. The county boards mail these voters notice cards to confirm if they've moved. *Id.* at 14.

Consistent with the NVRA's safe harbor process, 52 U.S.C. § 20507(c)(1)(B), the county boards

will: (1) update a voter's registration record if the voter confirms an in-county move, (2) cancel

the voter's registration if the voter confirms an out-of-county move, (3) make no change if the

voter confirms the same residence as on their registration record, or (4) initiate the address-

confirmation process outlined above if the county board receives no response. Ex. 1 at 16–18.

### III.    Plaintiff's Request for Records

On April 15, 2019, Plaintiff sent letters to the Defendant boards seeking records. Compl.

¶¶ 27–28. The content of those letters, which are incorporated into the Complaint by reference

and relied upon by Plaintiff, is attached as Exhibit 2. The letter requested eight categories of

documents, with multiple subcategories:

1. the entire statewide voter registration database;

2. the names and addresses of all person who were sent address confirmation notices pursuant to the NVRA, and information on whether the person responded;

3. all documents concerning the State Board's participation in the federal Election Administration & Voting Survey (EAVS);[2]

4. all documents concerning any "audit, evaluation, assessment, review, analysis, critique, or request for or response to any of the foregoing, relating to the accuracy and currency of official lists of eligible voters;"

5. all documents concerning any instance of voter fraud;

6. all official guidance from the State Board on efforts to ensure the accuracy and currency of the voters rolls;

7. all contracts with the U.S. Postal Service or any other federal agency to provide

---

[2] EAVS is a biennial report from the U.S. Election Assistance Commission on the administration of elections among the states. Compl. ¶ 34; Election Assistance Comm'n, Studies and Reports, https://bit.ly/3eq9P5r (last accessed July 19, 2020).

change-of-address information; and

8. all documents and communications concerning the Systematic Alien Verification for Entitlements (SAVE) database, the Interstate Voter Registration Cross-Check Program (Crosscheck), and the Electronic Registration Information Center (ERIC).[3]

Ex. 2 at 2–3.  Plaintiff's disclosure claim in this suit concerns <u>only</u> number 2.  Compl. ¶ 28.

The Complaint refers to "several follow-up emails" regarding Plaintiff's records requests.  *Id.* ¶ 30.  Those emails are incorporated into the Complaint and are attached as Exhibits 3 and 4.

On April 30, 2019, the State Board's public information officer, Patrick Gannon, provided a "preliminary response," which provided documents responsive to Plaintiff's requests, including a copy of the State Board's list-maintenance policy.  Ex. 3 at 1–2.  Mr. Gannon noted that the agency was working to locate additional documents responsive to Plaintiff's requests, but that it needed more time.  *Id.*  He also asked that Plaintiff provide specific search terms that would assist the State Board in fulfilling the request for all documents concerning voter fraud.  *Id.* at 2 (discussing request number 5).  On May 6, Plaintiff's counsel thanked Mr. Gannon for the initial production and invited the State Board to take additional time to respond.  *Id.* at 1.

On May 7, 2019, Mr. Gannon produced more documents and noted that the State Board needed additional time to locate and review the documents responsive to Plaintiff's request numbers 2, 5, and 8.  *See* Ex. 4 at 3.  On July 18, 2019, Plaintiff's counsel suggested a series of search terms for requests 5 and 8.  *Id.* at 2.  On August 6, 2019, Mr. Gannon informed Plaintiff that those searches produced over 140,000 results in the State Board's records system.  *Id.* at 2.  In a good-faith effort to comply with Plaintiff's remaining requests, Mr. Gannon suggested that

---

[3] SAVE is a Federal database that allows governmental agencies to verify a benefit applicant's citizenship status.  U.S. Citizenship and Immigration Servs., SAVE, https://bit.ly/2BzlY9m (last accessed July 19, 2020).  Crosscheck and ERIC are programs that allow states to share voter registration data with each other.  *See Moore v. Kobach*, 359 F. Supp. 3d 1029, 1032 (D. Kan. 2019); *Ohio A. Phillip Randolph Inst. v. Husted*, 350 F. Supp. 3d 662, 682 (S.D. Ohio 2018).

Plaintiff provide more specific search terms or limit the searches to document custodians who would most likely have responsive documents.  *Id.* at 1.

The next communication the State Board received from Plaintiff about its records request came eight months later, when the State Board received a copy of this lawsuit.  *See* Doc. 3-1.

## IV.    Plaintiff's Correspondence on Defendants' List-Maintenance Practices

Apart from the correspondence on Plaintiff's records requests, Plaintiff sent additional letters to the Defendant boards on December 11, 2019.  Compl. ¶ 48 & Docs. 1-1, 1-2.[4]  These letters claimed that the boards were violating section 8 of the NVRA by failing to make a "reasonable effort" to remove voters who die or move out of jurisdiction in Mecklenburg and Guilford Counties.  Doc. 1-1 at 2.  The letters made no mention of the records requests that Plaintiff apparently abandoned four months earlier.

The letters did not identify what the State Board or the county boards were doing that violated the NVRA.  Instead, the letters purported to compare the number of registered voters with the eligible voting-age population in Mecklenburg and Guilford Counties, and reported the alleged numbers of inactive voters and voters removed through the address-confirmation process in those counties.  *Id.* at 3.  In Plaintiff's estimation, these figures suggested "clear violations" of the "reasonable effort" provision of the NVRA.  *Id.*

The State Board's executive director, Karen Brinson Bell, responded on March 18, 2020, writing that Plaintiff's letter "failed to allege a factual basis that, if true, would constitute a violation of state or federal list maintenance requirements."  Doc. 1-3 at 1.  She explained that the NVRA forbids a state from removing voters without confirming a voter has moved, including through the address-confirmation process that delays removal for years.  *Id.* at 1–2.  She noted

---

[4]  The letters to the Mecklenburg and Guilford County Boards are substantively similar.

that counties with higher transient populations, including significant college populations, are likely to have higher percentages of registered voters due to the delays built into the NVRA. *Id.* at 1. She further explained that the data cited in Plaintiff's letter was misleading. *Id.* at 2. Finally, Ms. Bell invited Plaintiff to explain what it believed the State and county boards were doing wrong. *Id.* Plaintiff filed this lawsuit, instead, three weeks later.

## LEGAL STANDARDS

Under Rule 12(b)(1), the burden of proving subject-matter jurisdiction is on the Plaintiff. *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). The Court may consider evidence outside the pleadings to determine jurisdiction. *Id.* A motion to dismiss based on Eleventh Amendment immunity concerns the Court's jurisdiction. *Martin v. Wood*, 772 F.3d 192, 195 & n.* (4th Cir. 2014). Statutory standing under the NVRA is also jurisdictional. *Bellitto v. Snipes*, 221 F. Supp. 3d 1354, 1361 (S.D. Fla. 2016).

Under Rule 12(b)(6), a complaint must contain facts sufficient "to raise a right to relief above the speculative level" and to satisfy the court that the claim is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"—which requires more than facts "that are merely consistent with a defendant's liability." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).

Under Rule 12(b)(5), failure to properly serve process on a defendant deprives the Court of personal jurisdiction. *Scott v. N.C. Dep't of Revenue*, No. 3:13-CV-00294, 2014 WL 1267248, at *1 (W.D.N.C. Mar. 26, 2014). For a motion regarding insufficient service of process, "affidavits and other materials outside the pleadings may be properly submitted and considered." *Id.* (citation omitted).

Case 3:20-cv-00211-RJC-DCK   Document 38-1   Filed 07/27/20   Page 9 of 26

<u>**ARGUMENT**</u>

**I.     PLAINTIFF DID NOT PROPERLY SERVE DEFENDANTS.**

The method Plaintiff used to attempt to serve Defendants is unauthorized.  The Court therefore lacks jurisdiction over the Defendants.  *Scott*, 2014 WL 1267248, at *1.

Under Rule 4(j), a state, its agencies, and its officers may be served by either delivering the summons and complaint to the state's chief executive officer, or by serving the state or its agencies "in the manner prescribed by that state's law for serving a summons or like process on such a defendant."  Fed. R. Civ. P. 4(j)(2).  This second method of service is at issue here.

Under North Carolina's service rules, the State may be served through the Attorney General by personal service, registered or certified mail, or a "designated delivery service authorized pursuant to 26 U.S.C. § 7502(f)(2)."  N.C. Gen. Stat. § 1A-1, Rule 4(j)(3).  A state agency, such as the State Board, may be served through an appointed "process agent" by the same means.  *Id.*, Rule 4(j)(4)a.  The appointed process agent for the State Board is its general counsel.  *See* N.C. Dep't of Justice, Process Agent Directory, *available at* https://bit.ly/3hWizlQ. The same methods for service on state agencies apply to state officers.  *See id.*, Rule 4(j)(4)d.

Here, Plaintiff sent the summons and complaint to all Defendants via "Fedex Express Saver."  Exs. 5, 6, 7.  But Fedex Express Saver is not a "designated delivery service." under 26 U.S.C. § 7502(f)(2).  N.C. Gen. Stat. § 1A-1, Rule 4(j)(3).

The "designated delivery service" provision of the U.S. Code authorizes the Secretary of the Treasury to designate a private delivery service as an equivalent to registered or certified mail, if such service meets a number of qualifications.  *See* 26 U.S.C. § 7502(f).  Fedex Express Saver has not been deemed a "designated delivery service" by the Treasury Department.  *Herzog v. Comm'r*, 643 F. App'x 942, 943 (11th Cir. 2016); *Eichelburg v. Comm'r*, 106 T.C.M. (CCH) 606 (T.C. 2013); *Scaggs v. Comm'r*, 104 T.C.M. (CCH) 277 (T.C. 2012).  The Treasury

Department, through the Internal Revenue Service, issues public notices to designate delivery services that meet the qualifications of § 7502(f). *See Scaggs v. Comm'r*, 146 T.C. 230, 239 & n.8 (T.C. 2012). The current notice designates seven delivery services offered by Fedex, but it does not include Fedex Express Saver. I.R.S. Notice 2016-30, 2016-18 I.R.B. 676, 2016 WL 1719555. The Notice makes clear, "DHL Express, FedEx, and UPS <u>are not designated with respect to any type of delivery service not enumerated in this list</u>." *Id.* (emphasis added).

Accordingly, Plaintiff attempted service on the State Defendants via a method that is not authorized by the rules. The claims against these defendants should therefore be dismissed. *See Forshaw Indus., Inc. v. Insurco, Ltd.*, 2 F. Supp. 3d 772, 781 (W.D.N.C. 2014); *Land v. Food Lion, LLC*, No. 3:12-CV-00006, 2012 WL 1669678, at *4 (W.D.N.C. May 14, 2012). Service on Ms. Bell is improper for the additional reason that the pleadings were addressed to her, instead of the process agent for her agency. *See* N.C. Gen. Stat. § 1A-1, Rules 4(j)(4)a, 4(j)(4)d; *Cooper v. Stanback*, No. 1:13CV571, 2015 WL 1888285, at *2 (M.D.N.C. Apr. 15, 2015).

## II. THE STATE AND ITS ELECTIONS AGENCY ARE IMMUNE FROM SUIT UNDER THE ELEVENTH AMENDMENT.

"In our constitutional scheme, a federal court generally may not hear a suit brought by any person against a nonconsenting State." *Allen v. Cooper*, 140 S. Ct. 994, 1000 (2020). A state's immunity under the Eleventh Amendment extends to its agencies, such as the State Board. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984); *Walker v. N.C. State Bd. of Elections*, No. 1:17-CV-78, 2017 WL 4477295, at *1 (M.D.N.C. May 15, 2017).

Congress may abrogate states' Eleventh Amendment immunity only if two conditions are met: (1) "Congress must have enacted 'unequivocal statutory language' abrogating the States' immunity from the suit," and (2) "some constitutional provision must allow Congress to have thus encroached on the States' sovereignty." *Allen*, 140 S. Ct. at 1000 (quoting *Seminole Tribe*

11

*of Florida v. Florida*, 517 U.S. 44, 56 (1996)). Such "unequivocal" language abrogating immunity must appear in a statute's remedial language, not in its general language identifying violations of law. *See Seminole Tribe*, 517 U.S. at 56 (locating Congress's "clear statement" in references to "the State" in statute's remedial provision); *Dellmuth v. Muth*, 491 U.S. 223, 231 (1989) (holding that the clear statement must "speak to what parties are subject to suit").

The remedial provision of the NVRA does not authorize suits against the States. *See* 52 U.S.C. § 20510(b)(2). It provides that an "aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation." *Id.* The Supreme Court has held, and reiterated, that "a general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *Seminole Tribe*, 517 U.S. at 56 (quoting omitted); *Dellmuth*, 491 U.S. at 231.

A federal court in North Carolina recently addressed this issue, concluding that the NVRA does not contain unequivocal language abrogating state immunity. *Pub. Interest Legal Found., Inc. v. Bell*, No. 5:19-CV-248-BO, 2019 WL 5290920, at *2 (E.D.N.C. Oct. 17, 2019).[5] A Virginia district court agrees, *Krieger v. Loudon Cty.*, No. 5:13-CV-073, 2014 WL 4923904, at *3 (W.D. Va. Sept. 30, 2014), and that decision was affirmed, *Krieger v. Virginia*, 599 F. App'x 112 (4th Cir. 2015) (unpublished).

Accordingly, the claims against North Carolina and the State Board should be dismissed.

## III. PLAINTIFF CANNOT ESTABLISH STATUTORY STANDING DUE TO INSUFFICIENT NOTICE.

Plaintiff was required to provide clear notice of how Defendants were allegedly violating the NVRA before filing suit. It did not do so.

---

[5] The plaintiff in that case has appealed the dismissal of its NVRA claims against Executive Director Bell, but did not appeal the Eleventh Amendment immunity decision. *See* Doc. 13, *Pub. Interest Legal Found., Inc. v. N.C. State Bd. of Elections*, No. 19-2265 (4th Cir.).

Before filing an action alleging a violation of the NVRA, a plaintiff must "provide written notice of the violation to the chief election official of the State involved," 52 U.S.C. § 20510(b)(1), and afford the election official an opportunity to correct the violation within 90 days, *id.* § 20510(b)(2). "[F]ailure to provide notice is fatal" to a plaintiff's standing. *Bellitto*, 221 F. Supp. 3d at 1362 (quoting *Scott v. Schedler*, 771 F.3d 831, 836 (5th Cir. 2014)).

The purpose of the notice requirement is to "provide states in violation of the Act an opportunity to attempt compliance before facing litigation." *Ass'n of Cmty. Organizations for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997). Accordingly, if a notice letter is "too vague to provide [the defendant] with 'an opportunity to attempt compliance,'" the notice will be insufficient to confer standing. *Scott*, 771 F.3d at 836 (quoting *Miller*, 129 F.3d at 838); *see also Ohio A. Phillip Randolph Inst. v. Husted*, 350 F. Supp. 3d 662, 672 (S.D. Ohio 2018).

**A. The Notice Regarding Count I Was Too Vague to Serve Its Statutory Purpose.**

With respect to the alleged violation of the NVRA's "reasonable effort" provision, Plaintiff's December 2019 letter to the boards failed to explain how they were violating the NVRA. *See* Doc. 1-1. Plaintiff merely cited the provision of the NVRA's Section 8 that requires a "reasonable effort" to remove certain ineligible voters, but did not identify what elections administrators were doing that was <u>un</u>reasonable. *Id.* at 2. This was in spite of the fact that the State Board had provided Plaintiff the State's detailed list maintenance policy seven months earlier. *See* Ex. 3 at 2. Plaintiff therefore knew exactly what efforts the State and county boards were undertaking to remove ineligible voters. Plaintiff's inability to identify what effort, or lack thereof, was unreasonable under the NVRA failed to provide "an opportunity to attempt compliance before facing litigation." *Miller*, 129 F.3d at 838. Defendants were offered only a "vague" allegation of unreasonableness. *Scott*, 771 F.3d at 836; *Husted*, 350 F. Supp. 3d at 672.

13

Plaintiff's notice letter also included alleged ratios of registered voters versus the voting age population in the Defendant counties, along with alleged numbers of inactive voters and voters removed in a particular time period. Doc. 1-1 at 3. These figures do not show that a state or county board is violating the NVRA, much less how. In *Scott*, the plaintiff similarly gave notice of statistics about voter registration to assert a claim for a violation of the voter registration provisions of the NVRA. 771 F.3d at 836. There too, the statistics of registration rates were insufficient to notify the State how it was violating the NVRA's requirements. *Id.*

Plaintiff's statistics fail to give adequate notice of a violation here, in particular, because the NVRA <u>prevents</u> states from removing significant numbers of voters that are suspected of having moved. For voters who have not expressly confirmed that they have moved out of jurisdiction, the NVRA sets forth a lengthy address-confirmation process that delays by four years, at minimum, the removal of these voters. *See* 52 U.S.C. § 20507(d). In its notice letter, Plaintiff relied heavily on a 2018 report of the U.S. Election Assistance Commission to allege the voter registration rate is too high in Mecklenburg and Guilford Counties. (Doc. 1-1 at 2–3; Doc. 1-2 at 2–3) In that same report, however, the federal agency repeatedly warns against drawing conclusions about NVRA compliance based on the registration rates the agency reports, <u>precisely because</u> of the lag time the NVRA requires for the removal of voters. *See* U.S. Election Assistance Comm'n, Election Administration and Voting Survey, 2018 Comprehensive Report at 47, 49, 52, https://bit.ly/2Zlrx3L [hereinafter "EAVS 2018 Report"]. The NVRA also prevents states from carrying out any systematic programs to remove voters during long periods of time—90 days before every federal primary and general election (*i.e.*, six months out of every two years). 52 U.S.C. § 20507(c)(2)(A). The federal report relied on by Plaintiff in its notice also warns that this aspect of NVRA compliance <u>causes</u> ineligible voters to remain on the rolls.

EAVS 2018 Report at 52.  And, of course, having a high number of inactive voters simply means that a state is diligently sending regular confirmation mailings and tracking non-responses.

The NVRA also expressly sanctions a method of compliance with the "reasonable effort" provision that misses a large portion of likely ineligible voters.  The NCOA's safe-harbor process, which relies on moves reported to the U.S. Postal Service, is <u>all a state must do</u> to comply with the "reasonable effort" requirement with respect to people who have moved.  52 U.S.C. § 20507(c)(1).  And that process fails to reach up to 40% of voters who move, as the Supreme Court recently noted.  *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1840 (2018).

In other words, the NVRA itself is "partly responsible for inflated lists of registered voters."  *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 192 (2008).

Finally, comparing registered voters to population, as Plaintiff did in its letters, ignores important limitations on any conclusions that can be drawn from such a comparison.  Unlike the NVRA provisions that inflate the number of registered voters, nothing similarly inflates the population count.  Moreover, the population estimates in the EAVS Report that Plaintiff relied on are from 2017, while the registration figures are from late 2018.  EAVS 2018 Report at 49 n.29, 153.  So growing areas like Mecklenburg and Guilford Counties show artificially high registration rates under Plaintiff's calculation.  *See* N.C. Off. of State Budget & Mgmt., Projected Population Change in North Carolina Counties: 2010-2020, https://bit.ly/2Wkwp8w; *cf. Bellitto*, 935 F.3d at 1208 ("[I]n a jurisdiction with a substantially growing population, like Broward County, using the 2014 five-year estimate, therefore, would significantly underestimate the population for 2014, because it did not account for growth since 2012.").  Also, registration figures in the EAVS report reflect all voters registered at the time of the 2018 general election, EAVS 2018 Report at 154, 198, meaning that they reflect the height of voter registration before a

15

general election, during a time when the NVRA forbids states from conducting any voter removal programs. *See* 52 U.S.C. § 20507(c)(2)(A); *Bellitto*, 935 F.3d at 1208 (explaining how this can lead to misleading conclusions about NVRA compliance).

This case stands in contrast to cases finding that notice was sufficient. In *Georgia State Conf. of N.A.A.C.P. v. Kemp*, 841 F. Supp. 2d 1320 (N.D. Ga. 2012), the plaintiffs pointed to specific state policies that violated specific provisions of the NVRA, along with supporting facts. *Id.* at 1333–34. And in *Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919 (S.D. Ind. 2012), plaintiff explained to election officials that the state had abandoned compliance with a consent decree executed with the United States over prior specific NVRA violations. *Id.* at 921.

Because the figures reported in Plaintiff's letters do not demonstrate lack of compliance, the letters did not give the State or county boards the "opportunity to attempt compliance before facing litigation." *Miller*, 129 F.3d at 838. Plaintiff therefore lacks standing.

## B. There Was No Notice for Violations Outside Mecklenburg and Guilford Counties.

Plaintiff seeks statewide relief, Compl. ¶¶ 64–69, Prayer ¶ c, yet Plaintiff's letters provided no notice of a violation pertaining to list-maintenance activities conducted statewide. They pertained only to alleged violations "committed in Mecklenburg County," and "committed in Guilford County." (Doc. 1-1 at 1; Doc. 1-2 at 1)

After providing notice, a plaintiff may file suit only "as to the violations specified in the notice." *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1129 (D. Kan.), *aff'd*, 691 F. App'x 900 (10th Cir. 2016). Plaintiff therefore lacks standing to seek relief with respect to list maintenance activities pertaining to voters in any location outside Mecklenburg and Guilford Counties. *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) ("[S]tanding is not dispensed in gross . . . . To the contrary, a plaintiff must demonstrate standing for each claim he

seeks to press and for each form of relief that is sought." (citations and quotations omitted)).

**C. The Notice Regarding Count II Fails Because It Preceded the Alleged Violation.**

In its records request, Plaintiff wrote that the Defendants "will be deemed to be in violation of the NVRA" if they "do not produce these records" or fail to advise when it would make them available. Ex. 2 at 3. But a notice of an NVRA violation cannot be prophylactic. Notice is provided by "[a] person who <u>is aggrieved</u> by a violation," 52 U.S.C. § 20510(b)(1) (emphasis added), not a person who <u>will be</u> aggrieved upon some future occurrence.

As one court has concluded, "to allow a purported NVRA notice letter to serve such a dual purpose—that is, make an initial request for records and at the same time notify the records keeper of his or her failure to satisfy that request—. . . would, in the Court's view, defy logic and frustrate the purpose of the NVRA's notice provision (to provide an opportunity to attempt compliance before litigation)." *Bellitto*, 268 F. Supp. 3d at 1335. *Bellitto* explained how to comply with the notice requirement for a nondisclosure violation: after making a records request and the plaintiff concludes that defendant failed to comply with the disclosure provisions of the NVRA, the plaintiff must then "explain why Defendant's productions failed to satisfy those requests." *Id.* (pointing to the proper procedure followed in *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320 (N.D. Ga. 2016)); *see also. id.* at 1335 n.5.

Because Plaintiff never provided notice of a violation after Defendants' purported failure to provide requested records, Plaintiff lacks standing to bring this claim. *Id.* at 1335–36.

**IV. THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF THE "REASONABLE EFFORT" PROVISION OF THE NVRA.**

Defendants' processes constitute a "reasonable effort" as a matter of law—they exceed the minimum effort required by the NVRA. Plaintiff's misleading statistics cannot rebut this.

17

## A. The NVRA Accords Considerable Discretion to States in Undertaking a "Reasonable Effort" to Remove Voters Who Have Died or Moved.

As a threshold matter, the NVRA accords great deference to the states to design "a general program that makes a reasonable effort" to remove voters who have died or moved. 52 U.S.C. § 20507(a)(4). States must balance the tension between protecting eligible voters from unwarranted removal and keeping voter lists current. *Bellitto*, 935 F.3d at 1198 ("Undoubtedly, a maximum effort at purging voter lists could minimize the number of ineligible voters, but those same efforts might also remove eligible voters."). In furtherance of this balance, the NVRA "does not define what a 'reasonable effort' entails," *id.* at 1205, thereby reserving for states "substantial discretion" in crafting their list-maintenance programs, *Common Cause v. Brehm*, 432 F. Supp. 3d 285, 313 (S.D.N.Y. 2020).

The federal agencies that enforce and implement the NVRA have repeatedly recognized the significant degree of discretion provided by the "reasonable effort" provision. The U.S. Department of Justice, which enforces the NVRA through civil actions against the States, *see* 52 U.S.C. § 20510(a), confirms that states "have discretion under the NVRA . . . in how they design their general program, and States currently undertake a variety of approaches to how they initiate the notice process . . . ." U.S. Dep't of Justice, NVRA Questions and Answers, No. 36 (March 11, 2020), https://bit.ly/31IenAL (emphasis added) [hereinafter USDOJ Q&A]. The U.S. Election Assistance Commission, which is charged with monitoring state NVRA activities and reporting its findings to Congress, 52 U.S.C. §§ 20505(a)(1), 20508(a), similarly notes that "States and territories have considerable freedom to choose when, where, and how these functions are performed." EAVS 2018 Report, *supra*, at 51 (emphasis added). Finally, the Federal Election Commission, which until 2002 had the duties currently assigned to the Election Assistance Commission, *see* Pub. L. No. 107-252, § 802, published a guide to compliance with

the NVRA shortly after the law was enacted, noting that the "list maintenance requirements of the Act . . . permit the States considerable latitude in designing appropriate procedures." *See* Fed. Election Comm'n, Implementing the National Voter Registration Act of 1993 at 5-3 (Jan. 1, 1994), https://bit.ly/31w4ZA0 (emphasis added) [hereinafter "FEC Report"].

Plaintiff agrees. In a 2017 amicus brief to the U.S. Supreme Court, Plaintiff argued that the "reasonable effort" provision "does not list any particular steps that a 'general program' must incorporate, or specify exactly how a state should go about complying." Judicial Watch Amicus Br. at 6, *Husted v. A. Philip Randolph Inst.*, No. 16-980 (Aug. 7, 2017), *available at* https://bit.ly/3hlOOdj. Echoing federal guidance, Plaintiff explained that the NVRA "gives states considerable discretion," allows states "wide latitude" and "leeway," and "accords states a great deal of freedom" in designing their "reasonable effort" program. *Id.* at 4, 8, 9.

Accordingly, any claim that the NVRA prescribes a particular method of compliance with the "reasonable effort" provision is contradicted by the text of the Act, the cases interpreting it, the interpretation of the agencies that enforce the law, and Plaintiff's own prior positions.

**B. Defendants' List Maintenance Activities Comply With the NVRA.**

Not only does the "reasonable effort" provision accord "wide latitude" to the states, *id.*, the law also prescribes a safe harbor procedure that a state may implement to avoid unnecessary litigation like this. Defendants implement such a procedure, thereby defeating Count I.

The Complaint's allegations and incorporated documents show that the State and county boards implement the NCOA process, which establishes compliance with the "reasonable effort" provision for voters who have moved. *See* 52 U.S.C. § 20507(c)(1); *Bellitto*, 935 F.3d at 1203; *Condon v. Reno*, 913 F. Supp. 946, 953 (D.S.C. 1995); USDOJ Q&A, *supra*, No. 35. The NCOA process is carried out twice a year. Ex. 1 at 12. The county boards send mailings to

19

voters on their rolls who have been identified through the NCOA process, and if the voter confirms that he or she has moved out of jurisdiction, that voter is removed. *Id.* at 14, 16. If the voter fails to respond, the county sends an address-confirmation mailing and removes the voter after receiving no contact in the span of two federal elections, *id.* at 17–18, consistent with the NVRA, *see* 52 U.S.C. §§ 20507(c)(1)(B)(ii), (d)(2). Plaintiff does not allege otherwise. Defendants' use of the NCOA process therefore establishes that they comply with the law.

Plaintiff likewise makes no allegations that the State or county boards are failing to conduct a reasonable program to remove voters who have died, which is the other category of ineligible voters that are required to be removed under the "reasonable effort" provision. In fact, such voters are removed by county boards based upon records provided by the state health department on a monthly basis. N.C. Gen. Stat. § 163-82.14(b); Ex. 1 at 24. Those records report deaths occurring in North Carolina and in 35 other states. Ex. 1 at 24.

In *Bellitto*, the Eleventh Circuit held that by carrying out these two processes, a state complies with the NVRA's "reasonable effort" provision as a matter of law. 935 F.3d at 1205.

If Plaintiff were to rely on *Voter Integrity Project NC, Inc. v. Wake Cty. Bd. of Elections*, 301 F. Supp. 3d 612 (E.D.N.C. 2017), such reliance would be misplaced. Unlike that case, *id.* at 620, the record here establishes that Defendants are carrying out the NCOA safe-harbor process; there is no allegation otherwise. Plaintiff's claim in that case also specifically alleged the county failed to remove people excused from jury service, which is not at issue here. *Id.* at 619. In any event, the case's analysis of a plausible claim for a "reasonable effort" violation is outdated. It relied on *Bellitto v. Snipes*, 221 F. Supp. 3d 1354 (S.D. Fla. 2016), the district court decision that has since been superseded by the Eleventh Circuit's decision in that case. *See Bellitto*, 935 F.3d at 1203–04. The Eleventh Circuit's decision explains that the figures the

plaintiff offered in *Voter Integrity Project*, like the figures offered here, do not show a violation. *Id.* at 1208. *Voter Integrity Project* also did not have the benefit of the Supreme Court's explanation in *Husted* that the NCOA process fails to identify a large portion of voters who have moved, 138 S. Ct. at 1840, and therefore the minimum effort required by the NVRA will guarantee that significant numbers of voters who have moved will remain on the rolls.

Because the pleadings establish that the Defendant boards carry out the NCOA and death record processes, and there are no allegations otherwise, the Complaint states no plausible claim for a violation of the NVRA's "reasonable effort" provision.

### C. North Carolina Officials Exceed the "Reasonable Effort" Requirement.

Elections officials in North Carolina go beyond the minimum requirements and carry out various other activities to remove ineligible voters. Any allegation regarding these above-and-beyond procedures cannot state a claim for relief under the "reasonable effort" provision.

For example, the elections boards remove voters convicted of a state felony on a daily basis, after a 30-day notice period to account for potential data errors. N.C. Gen. Stat. § 163-82.14(c); Ex. 1 at 28. Voters convicted of federal felonies are removed quarterly. Ex. 1 at 29.

The State and county boards also conduct an address-confirmation mailing every odd-numbered year. N.C. Gen. Stat. § 163-82.14(d)(2); Ex. 1 at 5. This mailing is sent to every voter who has had no contact with the county board (through voting, registration changes, etc.) for a period spanning the previous two general elections, which amounts to a no-contact period of two years and three months. *See* Ex. 1 at 5. If a voter confirms they have moved, the county will remove that voter from the rolls. *Id.* But pursuant to the NVRA, the State and county boards <u>may not</u> remove any voter who fails to respond to the mailing, until two federal elections have taken place without the voter participating in an election. *See id.* at 7; 52 U.S.C. § 20507(d)(1)(B); N.C. Gen. Stat. § 163-82.15(d)(2).

21

Plaintiff's Complaint appears to focus on this address-confirmation mailing process. Compl. ¶¶ 40–46, 54–59. Importantly, however, because Defendants conduct the NCOA "safe harbor" process, any dispute over the address-confirmation mailing process is irrelevant to the issue of NVRA compliance. But even disregarding the NCOA process, the Complaint still could not state a claim for relief regarding Defendants' address-confirmation processes.

Plaintiff appears to suggest that the length of time a North Carolina voter must have lost contact with the county board before triggering an address-confirmation mailing is too long. *See* Compl. ¶¶ 55–58. No law supports that theory. "[N]o provision of federal law specifies the circumstances under which a return card may be sent. Accordingly, States take a variety of approaches." *Husted*, 138 S. Ct. at 1839.[6] *Husted* offers examples of how states may comply with the "reasonable effort" provision, including through the NCOA process or "sending notices to those who have not voted for some period of time." *Id.* (emphasis added). North Carolina, recall, does both. Regarding the latter notices, the Court cited with approval multiple states that wait longer than North Carolina before sending confirmation mailings. *Id.* Georgia and Pennsylvania require a voter to have had no contact for five years before sending a confirmation mailing, Ga. Code Ann. § 21-2-234; 25 Pa. Stat. and Cons. Stat. Ann. § 1901(b)(3), and Wisconsin waits four years, Wis. Stat. Ann. § 6.50(1). The Court also pointed to Oklahoma's statute, which operates identically to North Carolina's. Okla. Admin. Code 230:15-11-19(a)(3).

Plaintiff's brief to the U.S. Supreme Court in *Husted* also begs to differ with Plaintiff's position today. Plaintiff wrote, "the NVRA says nothing about the kinds of events that states may rely on as grounds for sending confirmation notices to those who are believed to have moved." Judicial Watch Amicus Br., *supra*, at 8 (emphasis in original). Plaintiff explained that

---

[6] "Return card" refers to the address-confirmation mailing. *Id.* at 1839.

22

"states are free to send confirmation notices on <u>any</u> nondiscriminatory and uniform basis." *Id.* at 5 (emphasis added). The only requirement for confirmation notices, according to Plaintiff, is that such notices "be sent prior to the commencement of the statutory waiting period of two general federal elections." *Id.* at 8. "<u>There is simply no basis for reading any other requirements into the statute</u>." *Id.* (emphasis added). Like the *Husted* decision, Plaintiff's brief held up as exemplars numerous states that rely on the same duration on non-contact as North Carolina, or more, before sending confirmation mailings. *See id.* at 16–17 & n.6.[7]

Defendants agree with these statements from Plaintiff's amicus brief. Aside from the specific provisions of 52 U.S.C. § 20507(d) that speak to the conduct of address-confirmation mailings, which North Carolina clearly complies with, "[t]here is simply no basis for reading any other requirements into the statute." *Id.* at 8.

### D.  The NVRA Does Not Set a Ceiling on Voter Registration Rates.

Ignoring the Defendants' list-maintenance measures that Plaintiff was made aware of in April 2019, Ex. 3 at 2, Plaintiff uses misleading statistics about voter registration to suggest the State and county boards are not removing enough voters. Such statistics do not rescue Count I.

The theory underlying Plaintiff's use of these statistics is that there is some maximum permissible ratio of registered voters to population, and some maximum permissible percentage of inactive voters, and if a jurisdiction exceeds those numbers, it must be violating the "reasonable effort" provision. *Res ipsa loquitur* is not a cognizable theory for an NVRA claim. Plaintiff's suggestion otherwise finds no support in the statute or case law. It also misconstrues

---

[7]  The FEC's guidance also recommended that states use a non-contact period of "four years, eight years, or the like" before sending an address-confirmation mailing, to avoid violating the prohibition on removing voters for nonvoting or violating the Voting Rights Act for disproportionately removing minority voters. FEC Report, *supra*, at 5-23.

the operation of the NVRA, which <u>ensures</u> that many ineligible voters will persist on the rolls as inactive voters for some time before a state can remove them.

Compliance with the NVRA leads to "inflated lists of registered voters." *Crawford*, 553 U.S. at 192; *see also United States v. Missouri*, No. 05-4391-CV, 2007 WL 1115204, at *4 n.7 (W.D. Mo. Apr. 13, 2007), *aff'd in part, rev'd on other grounds*, 535 F.3d 844 (8th Cir. 2008). That is because the Act greatly expands voter registration opportunities, 52 U.S.C. §§ 20503–06, while it greatly restricts the removal of voters from the rolls, 52 U.S.C. §§ 20507(a)(3), (b)(2), (c)(2)(A), (d). As noted above, *supra* pp. 14–15, the major restrictions that account for inflated rolls are the two-election-cycle delay in removing voters who fail to respond to an address-confirmation mailing, and the prohibition on conducting any removal programs for six months out of every two years. 52 U.S.C. § 20507(c)(2)(A), (d)(1)(B). The NVRA also expressly bars states from removing voters because they fail to vote. *Id.* §20507(b)(2). States must be cautious in designing their list-maintenance procedures to avoid violating this provision. *See* FEC Report, *supra*, at 5-21 (cautioning against sending confirmation mailings to all registrants, because some voters who continue to reside in the jurisdiction may fail to respond, thereby resulting in the removal of voters for failure to vote).

While these provisions cause voter rolls to be inflated, the efforts the NVRA requires states to undertake for the removing ineligible voters are modest. *Am. Civil Rights Union v. Philadelphia City Comm'rs*, 872 F.3d 175, 179 (3d Cir. 2017) (discussing the NVRA's "limited requirements" for removal). Although the law <u>permits</u> the removal of four categories of ineligible voters, it only <u>requires</u> the removal of two of those categories—always subject to the restrictions on removal identified above. *Id.* at 183; *Bellitto*, 935 F.3d at 1200, 1203. The law also explicitly sanctions a method of complying with the "reasonable effort" provision—the

NCOA process—that misses up to 40% of voters who have moved. *Husted*, 138 S. Ct. at 1840.

As the Third Circuit explains, "given the importance of the right to vote," the NVRA's Section 8

"is designed to protect voters from improper removal and only provides very limited

circumstances in which states may remove them." *Am. Civil Rights Union*, 872 F.3d at 182.

Accordingly, citing voter registration numbers that approach the number of eligible voters or the

percentage of inactive voters does not suggest a violation of the "reasonable effort" provision.

It is for these reasons that the federal agency charged with implementing the NVRA has

explicitly cautioned against using apparently high registration rates or inactive voters to draw

conclusions about compliance with the law. EAVS Report at 47, 49, 52. The EAVS Report

explains, "it is inevitable that registration rolls will contain some number of voter records for

individuals who are no longer eligible." *Id.* at 52. It further clarifies, "[s]ome states appear to

have registration rates that exceed 100 percent of the state's [citizen voting age population]

because of the long time period involved in removing ineligible voting records required by

NVRA." *Id.* at 49. This report, which Plaintiff relies on, dismantles Plaintiff's own theory.

Moreover, even assuming some level of voter registration could suggest an NVRA violation, the

statistics Plaintiff relies on are highly misleading, as explained above with regard to Plaintiff's

insufficient notice. *Supra* pp. 15–16; *see Bellitto*, 935 F.3d at 1208.

For these reasons, even ignoring that the Defendants already comply with the minimum

requirement of the NVRA's "reasonable effort" provision, the misleading statistics cited in the

Complaint do not state a plausible claim for a violation.

## CONCLUSION

Defendants respectfully request that Plaintiff's Complaint be dismissed.

This the 27th day of July, 2020.

JOSHUA H. STEIN
Attorney General

/s/ Paul M. Cox
Paul M. Cox Bar No. 49146
Olga E. Vysotskaya de Brito Bar No. 31846
Special Deputy Attorneys General
Attorneys for State Defendants
N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602
Telephone: (919) 716-6900
Fax: (919) 716-6920
Emails: pcox@ncdoj.gov
        ovysotskaya.ncdoj.gov

OFFICE OF GUILFORD COUNTY
ATTORNEY

/s/ J. Mark Payne
J. Mark Payne Bar No. 11046
Taniya D. Reaves Bar No. 51791
Attorneys for Guilford County Defendants
Office of Guilford County Attorney
301 W. Market Street
PO Box 3427 (27402)
Greensboro, N.C. 27401
Telephone: (336) 641-3852
Fax: (336) 641-3642
Emails: mpayne@guilfordcountync.gov
        treaves@guilfordcountync.gov